## IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

BERNADETTE THORN,

    Plaintiff,

v.

ADVANCED CARE FOR WOMEN, LLC.,

    Serve:

    Registered Agent
    Brian C. Josephs
    4604 Spotsylvania Pkwy, Ste 225
    Fredericksburg, Virginia 22408

  And

DR. BRIAN JOSEPHS,

    Serve:

    4604 Spotsylvania Pkwy, Ste 225
    Fredericksburg, Virginia 22408

    Defendants.

---

Civil Action No: 3:21-cv-123

**COMPLAINT**: Title VII – Discrimination On Account of Race, Hostile Work Environment through Sexual Harassment, Retaliation; Virginia Human Rights Act - Discrimination On Account of Race, Hostile Work Environment through Sexual Harassment, Retaliation; Wrongful Discharge in Violation of Public Policy

**Jury Trial Demanded**

---

## COMPLAINT

Comes now the Plaintiff, BERNADETTE THORN (hereinafter "Plaintiff" or "Mrs. Thorn"), and files this Complaint against Defendants, ADVANCED CARE FOR WOMEN, LLC ("Advanced Care") and DR. BRIAN C. JOSEPHS ("Dr. Josephs")(collectively hereinafter "Defendants"), and moves this Court for entry of judgement in her favor against the Defendants, as set forth herein:

## NATURE OF THE ACTION

1.    Plaintiff brings this action for damages and injunctive relief pursuant to the

Defendant's violations of the Title VII of the United States Code 42 U.S.C. §§ 2000e,

*et seq.*, the Virginia Human Rights Act, Virginia Code §2.2-3903, *et seq*, and to

redress Defendant's deliberate and willful unlawful employment discrimination and

retaliation against Plaintiff in violation of her state and federal rights.[1]

2.    This action against Defendants arises from Defendants' unlawful discrimination on

account of sex against the Plaintiff that created a hostile work environment;

discrimination on account of race; and retaliation against of Mrs. Thorn through

termination on account of her opposition to Dr. Josephs' advances.

## JURISDICTION AND VENUE

3.    Pursuant to 28 U.S.C. § 1331, the Eastern District of Virginia has proper subject matter

jurisdiction over this matter as it is a question of federal law.

4.    Specifically, this matter concerns the violation and interpretation of Title VII of the

United States Code 42 U.S.C. §§ 2000e, *et seq.*

5.    The Eastern District of Virginia, Richmond Division is the proper venue for this action

pursuant to 28 U.S.C. § 1391(c)(2) and 28 U.S.C. § 1391(b)(1),(2) as it is the District and

Division in which Defendant is incorporated and has a primary place of business; and is

the location at which the discriminatory practices were perpetrated, where the Plaintiff

was employed by Defendant, and is convenient to the parties and witnesses.

---

[1] "The conclusion also gives appropriate deference to those decisions from the Supreme Court of Virginia permitting a common law wrongful discharge claim to proceed against those officers or agents of a company who have played a key role in contributing to the company's tortious conduct allegedly inflicted on a wrongfully discharged plaintiff." McFarland v. Virginia Ret. Servs. of Chesterfield, L.L.C., 477 F. Supp. 2d 727, 739 (E.D. Va. 2007)(*See e.g.* , *Bowman, 331 S.E.2d at 798–801*).

**PARTIES TO THIS ACTION**

6.  Plaintiff, Bernadette Thorn, is White female American citizen in the United States and a resident of Fredericksburg, Virginia.

7.  At all times relevant to the allegations in this Complaint, Mrs. Thorn was an employee of Defendant at 4604 Spotsylvania Pkwy, Ste 225, Fredericksburg, Virginia 22408

8.  Defendant, Advanced Care for Women, LLC is a limited liability company existing under and by virtue of the laws of the State of Virginia, organized in Virginia, with its principal place of business at 4604 Spotsylvania Pkwy, Ste 225, Fredericksburg, Virginia 22408, Virginia.

9.  Defendant, Dr. Brian Josephs, is a Black male American Citizen of the United States residing in Fredericksburg, Virginia and the sole member-manager of Advanced Care for Women, LLC.

10. Defendants, at the time of the discrimination and retaliation described herein, employed at least fifteen employees and is an employer as defined by federal regulations 42 U.S.C. § 2000e(b).

**PROCEDURAL REQUIREMENTS**

11. On June 18, 2020, Plaintiff filed a charge of discrimination and retaliation in violation of Title VII with the Equal Employment Opportunity Commission ("EEOC"). Such charge was filed within one hundred eighty (180) days after the alleged unlawful employment practices in violation of 42 U.S.C. §§ 2000e, *et seq.* and Virginia Code §2.2-3903, *et seq.*, occurred.[2]

---

[2] Per the worksharing agreement between the Virginia Department of Human Rights and the Equal Employment Opportunity Commission this charge was simultaneously filed with the Virginia Department of Human Rights, preserving all state law causes of action under the Virginia Human Rights Act and wrongful termination.

12.     The EEOC issued Mrs. Thorn her Notice of Dismissal and Right to Sue on January 6, 2021. (See **Exhibit A** – Notice of Dismissal and Right to Sue)

13.     The Complaint in this matter was filed with this Court within ninety (90) days from the receipt of the Notice of Dismissal and Right to Sue.

14.     Mrs. Thorn has complied with EEOC and Title VII administrative requirements prescribed within 42 U.S.C. § 2000e and 29 C.F.R. § 1601.1 *et seq.*, having met her procedural and administrative deadlines, has elected to bring the action privately.

15.     Mrs. Thorn has exhausted all available administrative remedies prior to bringing this suit.

## FACTUAL ALLEGATIONS

16.     Mrs. Thorn is a White female.

17.     Mrs. Thorn was employed as an ultrasound technologist/Sonographer by Advanced Care for Women, LLC from December 30, 2019 until May 21, 2020.

18.     Advanced Care is a limited liability company whose sole owner-manager is Defendant, Dr. Brian Josephs.

19.     Dr. Josephs is the sole member-manager of Advanced Care, takes an active role in the management of personnel and policy at Advanced Care, and maintains complete decision-making control over Advanced Care, including control as head of any human resources office.

20.     Mrs. Thorn's yearly salary, per her contract, was $66,560.

21.     From the beginning of her employment with Advanced Care, in January 2020, Mrs. Thorn suffered sexual harassment by Defendant, Dr. Josephs.

22.    Dr. Josephs served as the direct supervisor to Mrs. Thorn as well as the manager of the practice as a whole. There is no individual who has authority over Dr. Josephs within Advanced Care.

23.    Dr. Josephs regularly and systematically sexually harassed Mrs. Thorn.

24.    Dr. Josephs sexually harassed Mrs. Thorn nearly every day that he worked in the office.

25.    Dr. Josephs' pervasive sexual comments, along with other lascivious actions described herein, were a constant threat to Mrs. Thorn while at work.

26.    These actions were so pervasive and perverse that they directly impacted Mrs. Thorn's employment with Advanced Care.

27.    Advanced Care, through Dr. Josephs, violated federal law and the laws of the Commonwealth of Virginia, discriminated against Ms. Thorn on account of sex through harassment, and retaliated against her for opposing the harassment.[3]

28.    Mrs. Thorn was a diligent employee who received no negative comments from her supervisor—Dr. Josephs—or the office manager Ms. Fyffe ("Ms. Fyffe").

29.    Mrs. Thorn never received any negative remarks from patients or coworkers during the course of her employment.

30.    Mrs. Thorn was the only ultrasound technologist/sonographer, a critical and essential position at Advanced Care in order for them to properly treat pregnant women, working at Advanced Care.

---

[3]According to the Fourth Circuit (and which test has been upheld numerous times in Federal District Courts, sexual harassment constitutes:  "(1) unwelcome conduct; (2) that was based on the plaintiff's sex; (3) that "was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment"; and (4) that was imputable to the employer." Riley v. Buckner, 1 F. App'x 130, 133 (4th Cir. 2001).

31.     Prior to her employment at Advanced Care, Mrs. Thorn was a patient of Dr. Josephs, as his patient, Mrs. Thorn received exams during which Dr. Josephs examined her breasts and performed vaginal surgery on her.

32.     As both a supervisor and former medical provider, Dr. Josephs held a position of authority and trust over Mrs. Thorn.

33.     Dr. Josephs consistently, deliberately, and despicably violated his position of trust and authority by sexually harassing Mrs. Thorn and, eventually, by terminating her for resisting his advances.

34.     Dr. Josephs leered at Mrs. Thorn from the time that she began work.

35.     Dr. Josephs would daily look her up and down, in the presence of coworkers, and mentally undress Mrs. Thorn.

36.     Mrs. Thorn, who often saw these looks—though many assuredly went unfound—was uncomfortable by the sexual nature of the stares directed at her.

37.     Mrs. Thorn asked Dr. Josephs why he was looking at her "like that, "and expressed that the looks were unwanted.

38.     In reply, Dr. Josephs said that he "just want[ed] to enjoy the view."

39.     Mrs. Thorn, sickened by Dr. Josephs advances, demonstrated that the behavior was unwanted in front of her coworkers, including Ms. Rebecca Rose ("Ms. Rose") and Ms. Ashley Fortune ("Ms. Fortune).

40.     While on lunch breaks Mrs. Thorn would reiterate to Ms. Rose and Ms. Fortune that Dr. Josephs was making advances and comments, and that they were unwanted..

41.     Mrs. Thorn indicated to Dr. Josephs that she did not want him staring at her and mentally undressing her.

42.  Dr. Josephs did not stop leering at Mrs. Thorn.

43.  Dr. Josephs followed his daily stares with comments on Mrs. Thorn's physical appearance.

44.  Dr. Josephs, on a nearly daily basis made comments that include but are not limited to: "Those scrubs look good on you;" "You're looking fine today;" and "Your hair looks so good."

45.  Once, Dr. Josephs instructed Mrs. Thorn to come into his office alone.

46.  Mrs. Thorn, unable to disobey her supervisor and the manager of the practice, entered.

47.  Dr. Josephs, instead of talking about professionally appropriate subjects, asked Mrs. Thorn if she did any "girly" things in the morning.

48.  Mrs. Thorn, who did not understand the purpose of the question, answered that she applied only light make-up.

49.  Dr. Josephs replied that he wished other girls could "look so good without putting much effort in."

50.  Dr. Josephs by stares, comments, and this interaction, demonstrated that he saw Mrs. Thorn as an object of sexual desire.

51.  In every preceding and following instances, including when she was in the presence of her coworkers including Ms. Becky, Ms. Amy, Ms. Ashley, and Ms. Julie (surnames unknown), Mrs. Thorn indicated to Dr. Josephs that these advances were unwanted and unreciprocated.

52.  Alone, these repetitive unwanted comments on Mrs. Thorn's appearance and unsought staring by Dr. Josephs would constitute sexual harassment and create a hostile work environment.

53. However, Dr. Josephs harassment of Mrs. Thorn did not stop at the daily leering and unwanted comments on her physical appearance.

54. This pervasive and constant sexual abuse was accompanied by instances of far more egregious conduct, despite Ms. Thorn's regular intimation that they were unwanted.

55. In January 2020, Dr. Josephs accosted Mrs. Thorn in an office.

56. Mrs. Thorn was alone in the office replacing batteries in one of the hand sanitizer dispensers.

57. Dr. Josephs entered the office where Mrs. Thorn was working alone.

58. Dr. Josephs approached Mrs. Thorn from behind and pressed himself close enough against Mrs. Thorn that she could feel him upon her back.

59. Having entered her personal space, Dr. Josephs leaned his head close to Mrs. Thorn's ears, so close that she could feel his breath in her ear.

60. Dr. Josephs then whispered: "Next time let me know and I'll give you the "D" for free."

61. Dr. Josephs, by this statement, was soliciting his genitals to Mrs. Thorn, knowing she was married, and having prior knowledge that his lewd and adulterously suggestive behavior was unwanted.

62. Mrs. Thorn immediately extracted herself from his pressure and expressed revulsion at both the comment and the implication of the comment.

63. Mrs. Thorn, as she had in the past, emphatically stated that his advances were unwanted through both language and body posture.

64. Dr. Josephs, understanding this to be a rejection, cajoled Mrs. Thorn with the comment: "Oh, that's how its gonna be."

65. Mrs. Thorn, attempting to reinforce the unwanted nature of his advances, stated back to Dr. Josephs affirming "That is how it is going to be."

66. Dr. Josephs by this and the other interactions with Mrs. Thorn - knew that she did not reciprocate his feelings and that his comments and advances were unwanted.

67. Dr. Josephs was and is the sole member-manager of Advanced Care, subsequently, because Dr. Josephs had knowledge that his harassment was unwanted, Advanced Care had equal knowledge.

68. Neither Dr. Josephs, nor Advanced Care, took any action to correct this unwanted behavior or protect Mrs. Thorn from further harassment of a similar nature, which she was subsequently forced to endure.

69. Mrs. Thorn had no human resources department to which report Dr. Josephs' advances.

70. Dr. Josephs, as Mrs. Thorn's supervisor and the sole member-manager of Advanced Care, is the only authority figure to which discriminatory or harassing behavior could be reported.

71. Dr. Josephs daily stares and comments on Mrs. Thorn appearance continued after the above incident.

72. Dr. Josephs further subjected Mrs. Thorn to even more degrading incidents of sexual harassment and solicitation.

73. As this harassment was ongoing, Mrs. Thorn tried to avoid being alone with Dr. Josephs but otherwise maintained a relaxed demeanor, afraid that to loud an opposition to his advances would cost Mrs. Thorn her job.

74. On or around late January 2020, Mrs. Thorn come into work with her hair in a braid, which was a hairstyle she wore rarely.

75. Dr. Josephs completed his usual staring up and down at Mrs. Thorn and added an additional lewd comment.

76. Having seen her hairstyle Dr. Josephs commented: "Damn that braid looks good on you. Man I'd like to hold on to that."

77. By this comment Dr. Josephs was implying his desire to grab Mrs. Thorn's hair while performing sexual acts upon her.

78. Mrs. Thorn, as she had before, expressed revulsion and rejection of the lewd sexual inuendo.

79. Dr. Josephs' lewd comments and daily leering continued following this incident, despite Mrs. Thorn's repeated attempts to express her discomfort with them.

80. On or about April 2020, Mrs. Thorn completed her daily tasks, and looking for more work to do to assist Advanced Care for the remainder of the day, asked her supervisor, Dr. Josephs, if there was anything else she could do.

81. Dr. Josephs, to this professional request for more work, did not provide any tasks for Mrs. Thorn to do nor did he tell her that she could be done for the day.

82. Dr. Josephs replied to Mrs. Thorn's request with a solicitation for adultery:

83. Specifically Dr. Josephs said: "I've got some things for you to do but I don't think Lee would like them very much."

84. "Lee" is Mrs. Thorn's husband.

85. Dr. Josephs, by this comment, understands that Lee is Mrs. Thorn's husband, and is explicitly implying that he wants Mrs. Thorn to commit adultery.

86. Dr. Josephs himself is also married and was inviting Mrs. Thorn to committing adultery as well as aiding and abetting his own adultery.

87. This solicitation to adultery and lascivious cohabitation, was made after Mrs. Thorn made a professional request for more work.

88. Dr. Josephs' suggestion implied that suitable "work" for Mrs. Thorn at Advanced Care would be to commit adultery and lascivious cohabitation with Dr. Josephs.

89. Mrs. Thorn, as she had before, refused Dr. Josephs' offer and vehemently asserted that such suggestions, solicitations, or comments were unwanted.

90. Later in April 2020, Dr. Josephs was preparing to do a cervical exam on a patient and stopped in the hallway in which Mrs. Thorn and another nurse, Ms. Becky were present.

91. Before entering to do the cervical exam, Dr. Josephs positioned himself to face Mrs. Thorn and licked his hand.

92. Dr. Josephs then mimed masturbating himself at Mrs. Thorn and finally mimed self-ejaculation at Mrs. Thorn.

93. Mrs. Thorn, as well as Ms. Rose, (both repulsed) indicated to Dr. Josephs that such behavior was unwanted and disgusting.

94. The next incident in which Dr. Josephs sexually harassed Mrs. Thorn occurred when Mrs. Thorn was cleaning the front of her scrubs As she was doing so she was approached by Dr. Josephs.

95. Dr. Josephs deliberately stopped what he was doing to stare at Mrs. Thorn's breasts as she wiped them free of the baby spit-up which had gotten on them.

96. Dr. Josephs, for the first time, indicated to Mrs. Thorn that he was aware his actions made her uncomfortable and said "I don't mean to be staring at your chest."

97. Dr. Josephs promptly leaned closer and stared more intently at Mrs. Thorn's breasts, even after the spit-up and cleaning had been completed.

98.  Dr. Josephs, when he said "I don't mean to be staring at your chest" was simply trying to get Mrs. Thorn to acknowledge that he was staring at her breasts and having received that acknowledgement intensified his lewd stares.

99.  Having leaned in close, Dr. Josephs expressed a small amount of glee to Mrs. Thorn that he could stare at her chest without consequence.

100.  Dr. Josephs continued his daily harassment of Mrs. Thorn following this incident by comments, stares, and mimes.

101.  After six months of innuendos, solicitations, and advances, Dr. Josephs was still rejected by Mrs. Thorn.

102.  Despite his constant efforts to induce her to intercourse, his endless commentary on her body, and his sexually explicit actions toward her, Dr. Josephs was never able to get Mrs. Thorn to acquiesce to his advances.

103.  Mrs. Thorn, both when she was alone and in the presence of coworkers, including Mrs. Rose, Ms. Fortune, Ms. Amy, and Ms. Julie, rejected Dr. Josephs advances.

104.  Dr. Josephs, having realized he would not make headway toward committing adulterous intercourse with Mrs. Thorn, decided to have her terminated for spurning his advances.[4]

105.  At the same time Mrs. Thorn was being discriminated against on account of her race by Ms. Fyffe, the practice manager at Advanced Care.

106.  Mrs. Thorn endured, along with other employees at Advanced Care, was discriminated against on account of her race.

---

[4] "The Court found that these general allegations, "coupled with a specific example" of sexual harassment, were enough to state a plausible claim." Taylor v. Millennium Corp., No. 1:15-CV-1046, 2016 WL 927185, at *8 (E.D. Va. Mar. 4, 2016)(Citing Riley v. Buckner, 1 Fed. Appx. 130,134 (4th Cir. 2001)).

107.   Mrs. Thorn was discriminated against on account of her race by Ms. Fyffe, a Black woman and the practice manager at Advanced Care, who acted on behalf of the organization as it pertains to employment decisions.

108.   Mrs. Thorn began to work with Ms. Fyffe in late March—after three months of having been subjected to Dr. Josephs sexual harassment.

109.   Ms. Fyffe required Mrs. Thorn to use her leave hours when she was late or took long lunches.

110.   Ms. Fyffe did not require Black employees to use leave hours when they were late or took long lunches.

111.   Ms. Fyffe forced Mrs. Thorn to use her leave time when Mrs. Thorn, on account of unforeseen delays, went over time on her lunch break by approximately 15 minutes.

112.   Ms. Fyffe filled out a leave slip on Mrs. Thorn's behalf and had her time deducted when she went over lunch for a few minutes, costing Mrs. Thorn actual leave time.

113.   Ms. Fyffe did not force Black employees of Advanced Care to use leave slips for long lunches or breaks.

114.   Advanced Care, in May, expanded to larger offices to accommodate their growing business.

115.   Mrs. Thorn was then only ultrasound technologist/sonographer working at Advanced Care, ultrasound technologists/sonographers were essential to the functions of Advanced Care.

116.   Ms. Fyffe's only superior at Advanced Care was Dr. Josephs.

117.   Mrs. Thorn, with no other recourse, raised the issue of Ms. Fyffe's discrimination with Dr. Josephs.

118. Dr. Josephs, seeing an opportunity to get in Mrs. Thorn's good graces (and perhaps convince her to sleep with him) intimated that he would help her to stop Ms. Fyffe's discrimination.

119. Dr. Josephs told Mrs. Thorn that they would have a meeting at which she (and other employees) could air her grievances.

120. Dr. Josephs had no such plans, and actually acted in concert with Ms. Fyffe from thereon to have Mrs. Thorn terminated for her opposition to his sexual advances and Ms. Fyffe's discrimination.

121. The meeting was a trap designed to have Mrs. Thorn air sufficient issues to warrant her termination.

122. Ms. Fyffe was present at the meeting regarding her discrimination and she took notes and interrogated Mrs. Thorn and other White employees in an effort to have them say something to have them terminated.

123. Despite this trap meeting, Mrs. Thorn did not say anything to warrant her termination, and only expressed her opposition to Ms. Fyffe's discriminatory practices.

124. Following her meeting with Dr. Josephs, Mrs. Thorn became aware that this was not the first time that Dr. Josephs had pretended to be on the side of a young female employee against the practice manager so that he could continue to harass them.

125. On May 21, 2020, Mrs. Thorn was called into Ms. Fyffe's office.

126. At this meeting, Mrs. Thorn was terminated, only being told that "they didn't have a place for her" and that they were "downsizing."

127. When Mrs. Thorn confronted Dr. Josephs about her termination he expressed to her that he didn't even know it was happening.

128. Contrary to this assertion, Dr. Josephs signature was on the termination paperwork that Mrs. Thorn had been given moments before. He clearly knew she was being terminated, per his own instruction.

129. Dr. Josephs, as sole Member-Manager of Advanced Care, had the ultimate decision making authority.

130. Dr. Josephs endorsed and approved Mrs. Thorn's termination in order to retaliate against her for spurning his advances and to remove her from the practice for her opposition.

131. Immediately following Mrs. Thorn's termination, Advanced Care hired a new ultrasound technologist/sonographer to fill Mrs. Thorn's role.

132. The newly hired ultrasound technologist/sonographer was Black.

133. Ms. Fyffe's cited "downsizing" was false—as is shown by the immediate hiring of her replacement, further proving that any alleged "reasons" for Mrs. Thorn's termination were pretextual – her firing was (a) to satisfy Ms. Fyffe's desire to rid the practice of a White employee; and (b) a retaliatory measure by Dr. Josephs to rid the practice of a woman who spurned his repetitive sexual advances.

134. Mrs. Thorn's termination happened on account of her opposition to Dr. Josephs sexual harassment and the discriminatory antipathy that Ms. Fyffe had toward her. (See **Exhibit B-** Text from Black coworker).

135. Ms. Fyffe had completed her scheme of discrimination against Mrs. Thorn and terminated her on account of her race so that she could hire a Black replacement. Her scheme additionally fit Dr. Josephs need to fire Mrs. Thorn for spurning his sexual advances.

136. Ms. Fyffe also forwarded her plan to terminate Mrs. Thorn on account of her opposition to Ms. Fyffe's discriminatory practices, which she had raised with Dr. Josephs.

137.    The daily sexual harassment Mrs. Thorn faced at Advanced Care from Dr. Josephs, her

boss, altered the conditions of her employment and made her workplace hostile.

138.    The numerous instances of sexual harassment enumerated above only constitute what

Mrs. Thorn remembers specifically, but in no way encompasses the entirety of comments,

advances, proposals, and suggestions leveled at her by Dr. Josephs, which are too

voluminous to recount in their entirety.

139.    Mrs. Thorn has diligently searched for work since her termination.

140.    Mrs. Thorn has been unable to find comparable work since her termination.

141.    Mrs. Thorn has suffered anxiety, emotional distress, humiliation and loss of enjoyment

since her harassment and termination.

## COUNT I: DISCRIMINATION ON ACCOUNT OF SEX THROUGH A HOSTILE WORK ENVIRONMENT

142.    Plaintiff reasserts and affirms the statements made in paragraphs 1-141

143.    Under 42 U.S.C. § 2000e-2, Defendants discriminated against Plaintiff on account of her

sex by subjecting her to a hostile work environment.

144.    Plaintiff is a White female.

145.    Defendant, Advanced Care, through Dr. Josephs, altered the conditions of Plaintiff's

workplace by subjecting her to constant and severe sexual harassment.

146.    Defendant, Dr. Josephs, was and is the sole member-manager of Advanced Care,

responsible for all of its decision making, operations, gains and losses.

147.    Dr. Josephs leered at Plaintiff daily.

148.    Plaintiff was uncomfortable with Dr. Josephs' looks and indicated as such to him.

149.    Dr. Josephs would regularly comment on Plaintiff's physical appearance.

150.    Plaintiff expressed to Dr. Josephs that she did not want his comments and that they made her uncomfortable.

151.    Dr. Josephs, even after having been told of the unwanted nature of his advances, continued them on a daily or near daily basis.

152.    Dr. Josephs confronted Plaintiff alone in a room and pressed himself up behind her, offering her his penis.

153.    Plaintiff expressed disgust and revulsion at this advance.

154.    Dr. Josephs acknowledged that Plaintiff had spurned the advance.

155.    Dr. Josephs invited Plaintiff to assist him in ways that her husband (Lee)  "Lee would not like."

156.    Dr. Josephs was soliciting Plaintiff to commit adultery with him.

157.    Plaintiff refused.

158.    Dr. Josephs commented on Plaintiff's hairstyle saying "he would like to pull on it" during sexual intercourse.

159.    Dr. Josephs mimed ejaculating himself to completion at Plaintiff in front of her coworkers, immediately prior to performing a pelvic exam on a patient.

160.    Dr. Josephs deliberately stared at Plaintiff's breasts, despite his knowledge that Plaintiff did not want his advances.

161.    Dr. Josephs comments, advances, and leers occurred on a nearly daily basis.

162.    Plaintiff regularly and consistently informed Dr. Josephs that his comments and advances were unwanted.

163.    Plaintiff's conditions of employment were altered by Dr. Josephs' harassment.

164.   Plaintiff was unable to perform her functions without concern that she would be solicited for sex, commented about sexually, or examined for her physical appearance by her superior, Dr. Josephs.

165.   Plaintiff suffered emotional distress, anxiety, and humiliation on account of Dr. Josephs' harassment.

166.   Plaintiff was eventually terminated for spurning Dr. Josephs' advances and for opposing his harassment of the Plaintiff.

167.   Both Dr. Josephs and Advanced Care jointly and severaly violated Plaintiff's rights under Title VII.

## COUNT II: DISCRIMINATION ON ACCOUNT OF RACE

168.   Plaintiff reasserts and affirms the statements made in paragraphs 1 – 167.

169.   Under 42 U.S.C. § 2000e-2, Defendants discriminated against Plaintiff on account of her race.

170.   Plaintiff was a White female employed by Defendants and working under Ms. Fyffe.

171.   Ms. Fyffe is an Black female.

172.   Ms. Fyffe demonstrated discriminatory behavior toward Plaintiff and other White coworkers over the course of her employment.

173.   Ms. Fyffe deducted Plaintiff's leave time by forcing leave slips on Plaintiff for long lunches, which was not required of Black employees.

174.   Ms. Fyffe, acting on behalf of Defendants, terminated Plaintiff on account of her race.

175.   Plaintiff was performing at or above the level expected of her by the Defendants at the time of her termination.

176.   Plaintiff had not had any negative performance reviews during her time employed by Defendants.

177.   Plaintiff's position was necessary to the operation of Defendants' business.

178.   Defendants, after Plaintiff's termination, immediately hired a new employee to fill Plaintiff's position at the same salary.

179.   The newly hired employee was Black.

180.   Other employees who worked for Defendant, who were Black, expressed to Plaintiff that she was terminated "because she is white."

181.   Defendants' through the office manager, Ms. Fyffe, terminated Plaintiff on account of her race.

### COUNT III: RETALIATION FOR OPPOSITION TO SEXUAL HARASSMENT

182.   Plaintiff reasserts and affirms the statements made in paragraphs 1-181.

183.   Under 42 U.S.C. § 2000e-3, Defendants retaliated against Plaintiff by terminating her on account of her opposition to Defendants' unlawful sex discrimination.

184.   Plaintiff was subjected to illegal activity as described in Count I.

185.   Plaintiff regularly rejected these advances and informed Dr. Josephs that she wanted his harassment to stop.

186.   Dr. Josephs, on behalf of Defendant, decided that he would not tolerate Plaintiff's opposition to his conduct any longer.

187.   Plaintiff was performing at or above the Defendants' expectations for her position at the time she was terminated.

188.   Plaintiff was working at an essential position for Advanced Care when she was terminated.

189. Defendant needed an employee in Plaintiff's position and did not need to cut the position for financial reasons.

190. A new employee was hired to Plaintiff's position immediately following her termination.

191. Dr. Josephs, in retaliation for Plaintiff's opposition, engineered her termination.

192. Dr. Josephs signed Plaintiff's termination letter, even as he expressed that he did not know about her termination to her personally.

193. Dr. Josephs signed off on Plaintiff's termination in retaliation for her opposition to his harassment as described in Count I.

194. Both Dr. Josephs and Advanced Care jointly and severaly violated Plaintiff's rights under Title VII and the Virginia Human Rights Act by retaliating against Plaintiff for opposing Dr. Josephs sexual harassment.

### COUNT IV: RETALIATION FOR OPPOSITION TO RACE DISCRIMINATION

195. Plaintiff reasserts and affirms the statements made in paragraphs 1-194.

196. Under 42 U.S.C. § 2000e-3, Defendants retaliated against Plaintiff by terminating her on account of her opposition to Defendants' unlawful race discrimination.

197. Plaintiff was subjected to illegal activity as described in Count II.

198. Plaintiff, in an effort to combat the discrimination she faced under Ms. Fyffe, contacted Dr. Josephs to rectify the problems.

199. Defendants concocted a plan to eliminate Plaintiff as a problem for her opposition to Ms. Fyffe's discrimination (and for her opposition to Dr. Josephs' harassment as described in Count I).

200. Dr. Josephs encouraged Plaintiff to "air her grievances" regarding the discrimination she and other White employees faced at Ms. Fyffe's hands at a company meeting.

201. This meeting was a trap designed to create a reason for Plaintiff's termination.

202. Dr. Josephs and Advanced Care subsequently used this meeting to explain why Ms. Fyffe wanted Plaintiff to be terminated.

203. Ms. Fyffe called Plaintiff into her office on May 21, 2020 to inform her that she was being terminated "for business reasons."

204. This explanation did not match what Plaintiff was told by Dr. Josephs, who expressed surprise that Plaintiff was being terminated.

205. These inconsistent explanations of termination in and of themselves raise inferences of pretextual termination "rationales."

206. Dr. Josephs had signed Plaintiff's termination letter, his surprise was not genuine.

207. Plaintiff was performing at or above Defendants' expectations for performance when she was terminated.

208. Plaintiff had never received a negative performance review prior to her termination.

209. Plaintiff was replaced immediately after her termination by a newly hired employee.

210. The newly hired employee who replaced Plaintiff worked at the same salary as Plaintiff, the newly hired employee was Black.

## **COUNT V: DISCRIMINATORY TERMINATION ON ACCOUNT OF SEX**

211. Plaintiff reasserts and affirms the statements made in paragraphs 1-210.

212. In the alternative to Count I, under Virginia Code § 2.2-3903, Defendants terminated Plaintiff on account of her sex.

213. Plaintiff was subjected to illegal activity as described in Count I.

214. Defendant terminated Plaintiff on account of her sex when she refused to engage in lewd and lascivious conduct with Dr. Josephs.

215. Plaintiff's sex was the cause for her termination due to her unwillingness to be subjected to a hostile work environment.

216. Plaintiff was an efficient, productive, and necessary employee.

217. Despite Plaintiff's work performance, Plaintiff was terminated on account of her refusal to engage in the sexual advances and solicitions forced upon her by her supervisor, Dr. Josephs.

218. Both Dr. Josephs and Advanced Care jointly and severaly violated Plaintiff's rights under Virginia law by terminating Plaintiff in contravention of public policy.

**COUNT VI: DISCRIMINATORY TERMINATION ON ACCOUNT OF RACE**

219. Plaintiff reasserts and affirms the statements made in paragraphs 1-218.

220. In the alterniative to Count II, under Virginia Code § 2.2-3903, Defendants terminated Plaintiff on account of her race.

221. Plaintiff was a White female employed by Defendants and working under Ms. Fyffe.

222. Ms. Fyffe is an Black female.

223. Ms. Fyffe demonstrated discriminatory behavior toward Plaintiff and other White coworkers over the course of her employment.

224. Ms. Fyffe deducted Plaintiff's leave time by forcing leave slips on Plaintiff for long lunches, which was not required of Black employees.

225. Ms. Fyffe, acting on behalf of Defendants, terminated Plaintiff on account of her race.

226. Plaintiff was performing at or above the level expected of her by the Defendants at the time of her termination.

227. Plaintiff had not had any negative performance reviews during her time employed by Defendants.

228.   Plaintiff's position was necessary to the operation of Defendants' business.

229.   Defendants, after Plaintiff's termination, immediately hired a new employee to fill

Plaintiff's position at the same salary.

230.   The newly hired employee was Black.

231.   Other employees who worked for Defendant, who were Black, expressed to Plaintiff that

she was terminated "because she is White."

232.   Defendants' through the office manager, Ms. Fyffe, terminated Plaintiff on account of her

race.

## COUNT VII: WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY

233.   Plaintiff reasserts and affirms the statements made in paragraphs 1-232.

234.   Dr. Josephs repeatedly solicited Plaintiff to engage in illegal activity by asking her to

have sex with him.

235.   Dr. Josephs repeatedly solicited Plaintiff to commit adultery and lewd and lascivious

cohabitation with him.

236.   Dr. Josephs repeatedly solicited Plaintiff to aid and abet him in his own adultery.

237.   Dr. Josephs knew that he was soliciting adultery when he acknowledged that Plaintiff's

husband would not like their activities.

238.   Plaintiff refused to engage in unlawful adultery and lascivious cohabitation with Dr.

Josephs.

239.   Persons who commit adultery are guilty of a Class 4 misdemeanor under the laws of the

Commonwealth of Virginia.[5]

---

[5] Virginia Code § 18.2-365

240.   Persons who commit lascivious cohabitation are guilty of a Class 3 misdemeanor under the laws of the Commonwealth of Virginia.[6]

241.   Outside of criminal punishment in Virginia, adultery provides grounds for immediate divorce.[7]

242.   The Commonwealth has established, in both criminal and civil statutory laws, an abhorrence for and public policy against adultery.

243.   Dr. Josephs terminated Plaintiff on account of her refusal to commit adultery with him.

244.   Defendants, through Dr. Josephs, terminated Plaintiff for refusing to engage in illegal activities and refusal to engage in activities against the public morals.

245.   Refusal to engage in illegal activity resulting in termination, particularly refusal to engage in adultery, is protected by the public policy of Virginia.

246.   Defendants' termination of Plaintiff for her refusal is a wrongful discharge in contravention of public policy

247.   Both Dr. Josephs and Advanced Care jointly and severaly violated Plaintiff's rights under Virginia law by terminating Plaintiff in contravention of public policy.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests judgement against the Defendant as follows:

1.   Appropriate declaratory relief declaring the acts and practices of Defendant to have been in violation of Mrs. Thorn's rights as secured by Title VII of the United States Code sections 42 U.S.C. §§ 2000e, *et seq.* and the Virginia Human Rights Act, Virginia Code § 2.2-3903;

---

[6] Virginia Code § 18.2-345

[7] Virginia Code § 20-91.

2. Permanently enjoin Defendant, its assigns, successor, agents, employees, and those acting in concert with them from engaging in discrimination against employees for gender or race;

3. For appropriate actual damages against Defendant for violations of the ADA in amounts no less than:

   a. $66,520 in back pay

   b. $15,000 in back payment of lost benefits

   c. $65,000 in front pay

4. For punitive damages against Defendant for willful discrimination under Count I of this Complaint in violation of Title VII for Sexual Harassment in an amount no less than $350,000;

5. For punitive damages against Defendant for willful retaliation under Count II of this Complaint in violation of Title VII for Discrimination on Account of Race in an amount no less than $350,000;

6. For punitive damages against Defendant for willful discrimination under Count III of this Complaint in violation of Title VII for Retaliation for Opposition to Discrimination on Account of Sex in an amount no less than $350,000;

7. For punitive damages against Defendant for willful retaliation under Count IV of this Complaint in violation of Title VII for Retaliation for Opposition to Discrimination on Account of Race in an amount no less than $350,000;

8. For punitive damages against Defendant for willful and deliberate wrongful discharge under Count VII of this Complaint in violation of public policy in an amount no less than $350,000;

9. For compensatory damages resulting from the wrongful discharge of Plaintiff in violation of public policy in amounts no less than $250,000 for stress, emotional distress, inconvenience, loss of enjoyment, humiliation, and loss of reputation;

10. For all other wages and benefits lost or denied;

11. For an award to Plaintiff of her reasonable attorney's fees, and costs incurred in this action, together with expert witness fees and expenses;

12. For an award of any additional amounts necessary to offset the adverse tax consequences of an award received in a lump sum;

13. For an award of pre-judgement and post-judgement interest on any monetary award; and

14. For an Order of any other relief this Court deems to be just and proper.

## DEMAND FOR JURY TRIAL

15. Mrs. Thorn, pursuant to Rule 38 of the Federal Rules of Civil Procedure, hereby demands a trial by jury in this action for all claims so triable.

Respectfully Submitted,

BERNADETTE THORN

_____
/s/
Brandon T. Bybee (VSB# 92140)
William B. Barteau (VSB# 93381)
BRANDON T. BYBEE, P.L.C.
P.O. Box 9528
Norfolk, VA 23505
Tel: (757) 568-0090
Fax: (866) 568-0090
brandon@bybeelegal.com
william@bybeelegal.com
*Counsel for Plaintiff*